825 F.2d 407
 1988 A.M.C. 670
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
INTERNATIONAL MARINE FUELS OF SAN FRANCISCO, INC.,
International Marine Sales, Inc., Plaintiff-Appellee,
v.
M/V CONSTELLATION GALAXY, Her Engines, Ground Tackle, etc.,
in rem., Defendant- Appellant,
and
Galmar Shipping Company, S.A., Claimant.
 No. 86-2639
 United States Court of Appeals, Fourth Circuit.
 Argued May 4, 1987.
Decided July 31, 1987.
 
 John H. Gross (Deborah A. Swindells, Anderson, Russell, Kill & Olick, P.C., Timothy W. Bouch, Young, Clement, River & Tisdale, on brief), for appellants.
 Benjamin Allston Moore, Jr. (David M. Collins, Buist, Moore, Smythe & McGee, on brief), for appellees.
 Before HALL and WILKINSON, Circuit Judges, and VAN GRAAFEILAND, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.
 PER CURIAM:
 
 
 1
 This admiralty case arises out of Constellation Navigation's failure to pay for two shipments of fuel that were delivered to its chartered ship, the Constellation Galaxy (Galaxy). Constellation argues that the fuel suppliers do not have valid maritime liens against the vessel because the agent of one supplier has already been paid and the other fuel company did not 'furnish' the fuel to the Galaxy in accordance with the Federal Maritime Lien Act. The district court upheld both liens, holding that Constellation did not pay the agent for the shipment and that the fuel was furnished to the Galaxy. We affirm.
 
 I.
 
 2
 This case involves a series of fuel purchases made by Constellation Lines through its purchasing agent, Constellation Navigation (Constellation). When buying fuel, Constellation dealt with International Marine Sales (IMS), but the fuel was actually delivered either by IMS, International Marine Fuels (IMF), or First Marine Petroleum (FMP). In April 1985, IMS directly supplied two Constellation-chartered ships, the Galaxy and the Constellation Faros, with $215,412.03 worth of fuel oil. Constellation Navigation failed to pay for this fuel; it sent two checks to IMS, but they both bounced. Constellation and IMS discussed assigning some freight moneys that Constellation was owed by R.J. Reynolds, but no assignments were made.
 
 
 3
 In May 1985, Constellation apparently contacted IMS for another fuel shipment for the Galaxy, which was now in Pireaus, Greece. IMS, acting through FMP, a fuel oil broker, arranged for IMF to deliver some fuel to the Galaxy. IMF purchased $90,919.84 worth of fuel from IMS and delivered it to the Galaxy. When Constellation failed to pay for this shipment, IMF and IMS began to exert significant pressure.
 
 
 4
 The Galaxy continued to need fuel oil. In June 1985, while the vessel was in New York, Constellation bought $86,216.95 worth of fuel from FMP. The fuel was delivered to a Constellation-chartered barge in New Jersey and then transferred to the Galaxy in New York. When FMP billed Constellation for the fuel, it sent the invoice to the Constellation Galaxy, c/o Constellation Navigation.
 
 
 5
 After Constellation received its expected freight payments, it decided to pay some of its fuel bills. In August 1985, Mr. Barone, the secretary-treasurer of Constellation Navigation, called Mr. Madden at IMS and said he had a check for him. Madden picked up the check, but before he deposited it, he discovered that the check was made out to 'International Marine Sales, as agents'. The amount of the check was $219,632.02 and, on the back of the check, there was a notation that the amount should be applied to three fuel shipments: the $90,919.84 Pireaus shipment made by IMF in May, and shipments made to the George C. and the Phoenix vessels.
 
 
 6
 Madden was understandably upset with the conditions placed on the check. No portion of the check was to be applied to the two April fuel shipments that IMS had provided to Constellation vessels. Moreover, IMS had not directly provided any of the three fuel shipments listed on the check; Constellation Navigation apparently wanted IMS to cash the check and then pay off the actual fuel suppliers. Rather than applying the check to the listed debts of other fuel companies, Madden called Barone and said he would apply the check to the two April shipments made by IMS. At first, Barone insisted that the check be applied to the three specified debts, but he finally told Madden that he did not 'give a damn what you do with the check.' Madden did not apply the check to any of the three debts, but apparently applied it to the April fuel deliveries.
 
 
 7
 IMF and FMP were never paid for the Pireaus or the New Jersey fuel deliveries. FMP assigned its claim to IMS. IMS and IMF eventually filed a complaint and the Galaxy was seized in Charleston, South Carolina. The ship was released when a bond was posted. Constellation believes it does not owe IMF for the Pireaus shipment because it gave a check to IMS, as agent for IMF, to pay for the fuel. Constellation also claims that the IMS lien is invalid because, when FMP supplied the fuel in New Jersey, it sold the fuel to Constellation on its own account and did not furnish the fuel to the Galaxy, as required by the Federal Maritime Lien Act. The district court upheld both liens.
 
 II.
 
 8
 The district court correctly held that both liens were valid. Constellation had the right to specify which debts should be paid by the check, but Barone waived this right during his conversation with Madden. Moreover, the fuel provided by FMP was furnished to the Galaxy; when a charterer purchases fuel for a specific ship, it cannot defeat a maritime lien simply by having the fuel delivered to a barge and then transferred to the vessel.
 
 
 9
 Under New York law, which applies in this case, Constellation had the right to select which fuel bills it would pay off first. The Mint Factors v. Castelle, 511 N.Y.S.2d 661 (1987); Laney v. Whitaker, 398 N.Y.S.2d 839 (1977). Thus, if Madden had deposited the check without any objections, IMF would be estopped from claiming that it was still owed for the Pireaus shipment. The district court, however, found that Barone waived this condition when he stated that he did not care what Madden did with the check. The parties devote a significant portion of their briefs to the issue of whether the district court's decision should be reviewed under a clearly erroneous or a de novo standard. Under either standard, we believe that the district court was correct in finding a waiver by Barone.
 
 
 10
 A debtor waives the right to specify which debts will be paid if he is aware of the right and intentionally relinquishes it. Werking v. Amity Estates, 155 N.Y.S.2d 633, 642 (1956); Silverstein Properties, Inc. v. Paine, Webber, Jackson & Curtis, Inc., 480 N.Y.S.2d 724, aff'd 493 N.Y.S.2d 110 (1984). In the typical case, Barone's statement, which was made in frustration at the end of a heated conversation, might not override the specific instructions on the check. In this case, however, there is enough evidence to suggest that Barone consented to IMS's demand that the check be applied to the earlier April fuel shipments.
 
 
 11
 IMS had been pressuring Constellation for payment on these fuel shipments. The two companies had discussed applying the R.J. Reynolds freight payments, which Constellation used to write the check, to the April payments. Moreover, after Madden told Barone that he would apply the check to the April shipments, Barone did not stop payment on the check, which would have been the prudent response to IMS's insistence on applying the check to different debts. Rather, Barone told Madden to redeposit the check after it bounced. Finally, the owners of the George C. vessel paid the fuel invoice that was listed on the August check that Barone gave to IMS, without suggesting that the bill had already been paid.
 
 
 12
 In light of the frequent pressure for payment by IMS, the prior negotiations over assigning the freight moneys, the failure to stop payment, and the subsequent payment of the George C.'s bill, it is not unreasonable to conclude that Barone waived the conditions on the check and permitted IMS to apply the money to an earlier debt. Constellation suggests that Barone intended to enforce the conditions on the check because, if IMF and FMP were not paid, they could have seized the Galaxy for nonpayment. One of IMS's April deliveries, however, was also to the Galaxy. Thus, Barone had the same incentive to pay off IMS for the April shipment to avoid having IMS seize the vessel. We agree with the district court that IMF has not been paid for the Pireaus shipment and is entitled to a lien on the Galaxy.
 
 
 13
 IMS also has a valid lien on the Galaxy for payment of the New Jersey shipment. The Maritime Lien Act states that a lien arises whenever a supplier 'furnishes' necessities to a vessel. 46 U.S.C. Sec. 971 (1975). The furnishing requirement is intended in part to ensure that the supplier was relying on the credit of the vessel, and not just the owner's credit, in providing the necessities. See Farwest Stell Corp. v. Barge Sea-Span 241, 769 F.2d 620, 624 (9th Cir. 1985); Inland Credit Corp. v. M/T Bow Egret, 552 F.2d 1148, 1152 (5th Cir. 1977). Constellation believes that the fuel was not furnished to the Galaxy because it was first loaded on a barge chartered by Constellation. If FMP had sold the fuel on Constellation's account, to be used as Constellation desired, then no lien would attach.
 
 
 14
 The fuel, however, was furnished to the Galaxy. There was substantial evidence at trial to show that FMP did not rely exclusively on Constellation Navigation credit when it provided the fuel. First, there was testimony that, because of the confusion surrounded the flagging of Greek ships, FMP always looked to the lien on ships for payment. Second, when FMP billed Constellation for the fuel, it sent the invoices to the Constellation Galaxy, c/o Constellation Navigation. Third, the entire shipment of fuel was delivered directly from the barge to the Galaxy, using the barge as a mere conduit. No one believed that the fuel was being provided to Constellation for the company to use at its discretion; both parties knew that the fuel was to be used by the Galaxy. As the district court found, FMP 'had relied upon the credit of the vessel and not her owners.' The district court properly found that fuel was furnished to Galaxy. Thus, the FMP lien, which was assigned to IMS, is valid.
 
 
 15
 In sum, IMF has a valid maritime lien against the Galaxy for the Pireaus shipment of $90,919.84, plus interest and reasonable attorney fees as provided for in the fuel invoice. IMS has a valid lien against the Galaxy for the $86,216.95 New Jersey fuel shipment, plus interest according to the fuel invoice.
 
 
 16
 AFFIRMED.